

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: October 29, 2025.**

_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | CHAPTER 7 CASE |
| | § | |
| | § | |
| ELIZABETH YETMAN CHAVEZ, | § | CASE NO. 23-51605-CAG |
|     Debtor. | § | |

| | | |
|---|---|---|
| KEVIN M. EPSTEIN, UNITED | § | |
| STATES TRUSTEE. | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | ADV. NO. 24-05024 -CAG |
| | § | |
| ELIZABETH YETMAN CHAVEZ, | § | |
|     Defendant. | § | |

**MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART THE FIRST AMENDED COMPLAINT OBJECTING TO DISCHARGE OF <u>ELIZABETH YETMAN CHAVEZ</u>**

    This Memorandum Opinion resolves adversary proceeding *Kevin M. Epstein v. Elizabeth Yetman Chavez*, Adv. No. 24-05024-CAG. On September 4, 2025, this Court concluded a two-day trial before taking the matter under advisement. The Court has reviewed the entire record before

1

it, including all admitted exhibits. The Court also considered the testimony and credibility of Ms. Chavez, the only witness to testify. The Court has also considered the deposition testimony of ARS's former counsel, Sydney Carr (previously Sydney Ollar). Additionally, the Court has considered all evidentiary objections raised and sustained in making its findings of fact.

## JURISDICTION

As an initial matter, the parties have stipulated to, and Court finds it has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. (ECF No. 34, ¶ C).[1] This matter is a core proceeding as defined under 28 U.S.C. § 157(b)(2)(J). Venue is proper under 28 U.S.C. § 1409(a). This matter is referred to the Court pursuant to the District's Standing Order of Reference. The Court makes findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052. As noted herein, Trustee seeks a denial of Debtor's discharge under 11 U.S.C. §§ 727(a)(2)(A), (a)(2)(B), (a)(4)(a), (a)(5) and (a)(7).[2]

## BACKGROUND

On November 21, 2023, the Defendant filed a voluntary petition (the "Petition"). under Chapter 7 of the Bankruptcy Code. Johnny Thomas was appointed interim Chapter 7 trustee (the "Chapter 7 Trustee").

On December 5, 2023, Defendant filed her Schedules and Statement of Financial Affairs ("SOFA"). Before filing the Schedules, Defendant signed the Declaration Concerning Debtor's Schedules declaring under penalty of perjury that she had read the Schedules and that they were true and correct to the best of her knowledge, information, and belief. Before filing the SOFA, Defendant signed the SOFA declaring under penalty of perjury that she had read the answers to the questions therein and that they were true and correct.

---

[1] Unless otherwise noted' "ECF No. _" refers to the electronic case filing number in this adversary proceeding.
[2] Unless otherwise noted, all references are to Title 11, U.S.C. *et seq.*

Defendant appeared at the December 19, 2023, meeting of creditors (the "Meeting of Creditors") and testified under oath that she had read the Schedules and SOFA before she signed them. Defendant testified at the Meeting of Creditors that the Schedules listed all her assets and liabilities. Defendant further testified at the Meeting of Creditors that the Schedules were true and correct. Defendant further testified at the Meeting of Creditors that the SOFA was true and correct.

The Chapter 7 Trustee adjourned the Meeting of Creditors to January 9, 2024, and then to February 6, 2024. On February 6, 2024, Defendant appeared and testified under oath concerning the bankruptcy case. The Chapter 7 Trustee adjourned the Meeting of Creditors to February 13, 2024. On February 13, 2024, Defendant appeared and testified under oath regarding the bankruptcy case. The Chapter 7 Trustee adjourned the Meeting of Creditors to March 5, 2024.

On February 13, 2024, Defendant filed Amended Schedule A/B, Amended Schedule C (the "Amended Schedules"), and an Amended Statement of Financial Affairs (the "Amended SOFA"). Before filing the Amended Schedules, Defendant signed the Declaration with the Amended Schedules, under penalty of perjury, stating that she read them and that they were true and correct. Before filing the Amended SOFA, Defendant signed the Amended SOFA declaring under penalty of perjury that she had read the answers to the questions therein and that they were true and correct.

Defendant appeared and testified under oath at the March 5, 2024, Meeting of Creditors. The Chapter 7 Trustee concluded the Meeting of Creditors on March 5, 2024.

On April 4, 2024, Defendant filed Amended Schedules A/B, C, D, E/F, and H (the "Second Amended Schedules"). Before filing the Second Amended Schedules, Defendant signed the Declaration with the Second Amended Schedules that declares under penalty of perjury that she read the Second Amended Schedules and that they were true and correct.

**DEFENDANT'S EXECUTION OF THE SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS AND TESTIMONY AT THE MEETING OF CREDITORS IN IN RE ARS SPECIALTY CONTRACTORS, LLC ("ARS")**

On June 15, 2023, ARS filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "ARS Petition"). Defendant signed the ARS Petition as President of ARS. ARS is pending before the Court under Case No. 23-50751-CAG.

On July 6, 2023, ARS filed Schedules (the "ARS Schedules") and Statement of Financial Affairs (the "ARS SOFA"). Before filing the ARS Schedules, Defendant signed the Declaration Under Penalty of Perjury for Non-Individual Debtors, declaring under penalty of perjury that she had read the ARS Schedules and that they were true and correct. Before filing the ARS SOFA, Defendant signed the Declaration to the ARS SOFA declaring under penalty of perjury that she had read the answers to the questions therein and that they were true and correct.

Defendant testified under oath on behalf of ARS at the July 14, 2023, meeting of creditors (the "ARS Chapter 11 Meeting of Creditors"). Defendant testified at the ARS Chapter 11 Meeting of Creditors that she reviewed the ARS Schedules before she signed them. Defendant further testified at the ARS Chapter 11 Meeting of Creditors that the ARS Schedules were true and correct. Defendant further testified at the ARS Chapter 11 Meeting of Creditors that the ARS Schedules disclosed all the assets and liabilities of ARS. Defendant further testified at the ARS Chapter 11 Meeting of Creditors that she reviewed the ARS SOFA before she signed it. Defendant further testified that she read both the questions and the answers to the ARS SOFA before she signed it. Defendant also testified at the ARS Chapter 11 Meeting of Creditors that the answers to the ARS SOFA were true and correct. The U.S. Trustee adjourned the ARS Chapter 11 Meeting of Creditors to July 27, 2023.

The Court converted the ARS case to a chapter 7 proceeding on July 21, 2023. On October 6, 2023, ARS filed Amended Schedules After Conversion (the "ARS Conversion Schedules"). Before filing the ARS Conversion Schedules, Defendant signed the Declaration Under Penalty of Perjury for Non-Individual Debtors, declaring under penalty of perjury that she had read the ARS Conversion Schedules and that they were true and correct.

Defendant testified under oath on behalf of ARS at the October 10, 2023, meeting of creditors in the chapter 7 case (the "ARS Chapter 7 Meeting of Creditors"). Defendant further testified at the ARS Chapter 7 Meeting of Creditors that the ARS Conversion Schedules disclosed all the assets and liabilities of ARS.

### THE PARTIES' CONTENTIONS

Plaintiff alleges that Defendant failed to disclose in her Schedules that she had a USAA life insurance policy; a bourbon collection; a cause of action against her estranged spouse, Ramiro Chavez, for allegedly stealing her personal property; and a transfer of diamond earrings to her sister. Trustee also alleges that there were omissions on the ARS Schedules; that there is an unexplained loss of or deficiency of assets in the ARS case; and that Defendant took a $20,000.00 withdrawal from ARS prior to the petition date and that Defendant failed to disclose an unreported claim of embezzlement by a former employee.

Plaintiff alleges that the Defendant has owned and managed numerous businesses since 2012. Defendant denies the allegations and asserts that Defendant's role in ARS Specialty Contractors, LLC was significantly curtailed in 2019 when her husband, Ramiro Chavez, who was General Manager of ARS, removed her from active management and operational control. Defendant returned to ARS in 2023 to stabilize operations, as ARS was in financial distress.

Plaintiff alleges that, after being questioned at the February 6, 2024, Meeting of Creditors concerning assets listed on her Inventory[3] but not disclosed on the Schedules, Defendant disclosed for the first time that her estranged husband, Ramiro Chavez, had allegedly taken her property. Defendant denies the allegations and asserts that Defendant prepared her schedules and statements to the best of her understanding of their requirements at the time of drafting. Upon realizing that certain disclosures may have been incomplete or inaccurate, she promptly amended her filings in good faith, with the understanding that the San Antonio Police Department claims relating to property between spouses were not reportable per SAPD policy and were not valid "claims."

Plaintiff alleges that Defendant has failed to provide any documentation that would corroborate her testimony that she sold the diamond earrings to her sister for $1,000 cash. Defendant denies the allegation and asserts that the sale of Defendant's earrings to her sister was informal and did not involve written documentation. As such, there is no documentation to provide.

Plaintiff alleges that Defendant took $20,000.00 in cash from the ARS Jefferson Bank account ending in 5715, and that the $20,000.00 was property of the ARS bankruptcy estate. Defendant denies the allegations and asserts that Defendant did not "take" the $20,000.00—rather, she withdrew cash pre-petition to provide funds for business expenses within the early stages of the ARS Chapter 11 case. The $20,000.00 check was written prior to ARS's petition date, and it was not a post-petition withdrawal. Defendant argues the funds were used exclusively for ARS's ordinary operating expenses while the initial budget was pending approval. Defendant did not initially disclose the $20,000.00 withdrawal. Moreover, Frost Bank, the secured creditor having a lien on ARS assets, was fully compensated for the $20,000.00. Upon realizing the check might

---

[3] Defendant has a pending divorce proceeding against her husband in which Defendant was required to file an Inventory and Appraisement of her assets with the State Court. Plaintiff has examined the inventory and asserts that there are omissions or inconsistencies between the Inventory and Defendant's Schedules.

need to be disclosed, Defendant notified her attorney, provided a copy of the check and receipts documenting the expenditures—all prior to the filing of ARS's Schedules. Defendant asserts that she relied upon the ARS bankruptcy attorney's decision not to include the $20,000.00 withdrawal in the ARS Schedules.

Plaintiff alleges that Defendant paid $6,350.00 of ARS cash to Gavin Investment LLC (an entity that Defendant has 100% ownership) on or about June 21, 2023. Defendant denies the allegations and asserts that ARS paid a $6,350 monthly rent payment to Gavin Investment LLC as a customary business expense. Defendant states she was unaware that Gavin Investment LLC is considered an insider. Defendant asserts that the transfer in question was not made with the intent to hinder, delay, or defraud creditors. Rather, the rent paid was a usual and necessary business expense for fair market value. Defendant disclosed her interest in Gavin Investment LLC to counsel for ARS as well as all rental payments. Also, Defendant argues that transfers between insiders are not a basis for denial of discharge.

Plaintiff alleges that the ARS Schedules and SOFA do not adequately explain the loss of assets, including ARS's gross earnings in 2021, 2022, and 2023, the Payment Protection Plan ("PPP") Loan received in 2021 that went unpaid, and the accrual of payroll (Form 941) taxes.[4] Defendant denies the allegations and asserts that ARS's financial decline and ultimate insolvency were the result of a combination of several factors, including severe losses on jobs, financial mismanagement by ARS's General Manager, COVID-19-related business disruption, and

---

[4] The IRS did not file a proof of claim for trust fund taxes in Ms. Chavez's personal chapter 7 case. 26 U.S.C. § 6672. (§ 6672 provides in part that the failure to remit payroll taxes to the IRS imposes a tax liability on the responsible party who failed to do so). The IRS did file a proof of claim in the ARS bankruptcy case (Bankruptcy No. 23-50751) (Claim no. 12-2) in the total amount of $2,534,053.85. The IRS's proof of claim primarily consists of unpaid unemployment taxes (Form 940) for years 2020-2023, corporate income taxes (Form 1120) for years 2021-2023; and payroll taxes (Form 941) for the first quarter of 2021 through second quarter of 2023. Based on Ms. Chavez's testimony as to her involvement and operation of the ARS business, most of the taxes accrued during Ramiro's Chavez's management of ARS.

operational difficulties, all of which are well-documented through contemporaneous business records and communications.

Defendant maintains that she relied upon counsel for the preparation and filing of bankruptcy-related documents and forms. Defendant provided all records and information to counsel who are experienced in bankruptcy matters.

Each area of scrutinized conduct relates to one or more code provisions, allowing a denial of discharge as set forth below.

## FINDINGS OF FACT

### I.    Stipulated Facts

On July 28, 2025, the Parties submitted a Joint Pre-Trial Order with their statement of stipulated facts, which the Court now adopts. *See* (ECF No. 34, § E).

### II.    Facts Adduced at Trial

As an initial matter, the Court has weighed the credibility of the two witnesses: Defendant Elizabeth Yetman Chavez and Sydney Carr. The Court accepts Ms. Carr's testimony as credible. The Court finds that Ms. Chavez was at times credible, other times evasive, and during testimony of key facts, not credible. The Court notes that Ms. Chavez signed schedules and statements of financial affairs in three bankruptcy cases. Further, the Court notes that Ms. Chavez is a licensed attorney, having worked as an Assistant City Attorney and Assistant District Attorney. Also, Ms. Chavez testified that she suffered abuse from her husband, Ramiro Chavez.

Ms. Chavez admitted that she read and signed her original Schedules and SOFA on December 5, 2023.[5] Defendant stated that she read and signed the Amended Schedules and SOFA

---

[5] UST-1 ("UST-"refers to United States Trustee Exhibit _). Bankruptcy Case 23-51605, Schedules, SOFA, and Summary (ECF No. 13).

on February 13, 2024.[6] Defendant stated she read and signed the Second Amended Schedules and SOFA on April 4, 2024.[7] Defendant testified that she read and signed the Third Amended Schedules and SOFA on November 19, 2024.[8] All Schedules and SOFAs were signed under penalty of perjury.

Defendant stated that she formed ARS in 2012 and that she is the 100% owner. Defendant stated that she wanted to keep ARS separate from her husband because Ramiro Chavez had judgments against him and was delinquent on paying payroll taxes for his business. Defendant stated that ARS was a woman-owned business that was given preference on certain contracts. Ramiro Chavez was the general manager of the ARS, and he operated ARS. Defendant explained that she did billing, marketing, and other operational responsibilities for ARS from 2016–2019. She further testified that ARS had gross sales of over $10 million for 2021 and 2022.

Ms. Chavez stated that she and her husband became estranged in 2019, and that Mr. Chavez moved out of their marital home in 2019. Ms. Chavez filed for divorce in September 2022, and the divorce case is still pending. Defendant stated that the pending divorce has been a distraction and has emotionally strained her. Defendant testified that ARS was in poor financial condition when she took it over in 2023. Upon taking over ARS again, Defendant explained that her focus was to collect accounts receivable.[9] Ms. Chavez stated that she made the decision to put ARS into bankruptcy, but that she did discuss with Mr. Chavez business operations and her decision to file chapter 11 for ARS. Defendant explained that, in addition to ARS's financial distress, ARS was involved in litigation with some of its subcontractors and that there were several lawsuits pending.

---

[6] UST-2 Bankruptcy Case 23-51605, Amended Schedules and SOFA, and Summary (ECF No. 32).
[7] UST-3 Bankruptcy Case 23-51605, Amended Schedules and SOFA, and Summary (ECF No. 65).
[8] UST-4 Bankruptcy Case 23-51605, Amended Schedules and SOFA, and Summary (ECF No. 125).
[9] D ("Defendant" Exhibit _) – 12 is an ARS spreadsheet reflecting roughly $19.7 million in contracted work.

Defendant stated that she gave all her financial information to Joyce Lindauer and Sydney Ollar (ARS bankruptcy counsel) and was in daily contact with Lindauer, providing information for ARS's Schedules and SOFA. Ms. Chavez testified that she did not know about ARS having unpaid payroll taxes or that Daniella Vasquez (former ARS controller) was embezzling funds from ARS when Vasquez was hired in early 2021. Defendant explained that she discovered the embezzlement in May 2022.

Defendant testified that she read and signed the original Schedules[10] and SOFA[11] for ARS on July 6, 2023, under penalty of perjury. Ms. Chavez stated that she read and signed the conversion Schedules and SOFA for ARS on October 6, 2023, under penalty of perjury.[12]

Ms. Chavez testified multiple times at her § 341 Meeting of Creditors in her personal case. Ms. Chavez's first meeting of creditors was held on December 19, 2023.[13] Defendant's second meeting of creditors was held on February 6, 2024.[14] Defendant had a third and final meeting of creditors on March 5, 2024.[15]

During her second meeting of creditors, Defendant was questioned about the inventory and appraisal report in her divorce case.[16] The Inventory and Appraisement of Elizabeth Y. Yetman was signed and verified on February 23, 2023.[17] There are discrepancies between the Inventory and Appraisement ("Inventory"), Defendant's Schedules and SOFAs, and her testimony during her § 341 Meetings of Creditors. First, Defendant listed a USAA insurance policy on her Inventory

---

[10] UST-5 Bankruptcy Case 23-50751, Schedules (ECF No. 49).

[11] UST-6 Bankruptcy Case 23-50751, SOFA (ECF No. 50).

[12] UST-6 Bankruptcy Case 23-50751, conversion Schedules and SOFA (ECF No. 50).

[13] UST-8 Bankruptcy case No. 23-51605, Transcript of 341 Meeting.

[14] UST-9 Bankruptcy case No. 23-51605, Transcript of 341 Meeting.

[15] UST-10 Bankruptcy case No. 23-51605, Transcript of 341 Meeting.

[16] UST-14 Bankruptcy Case 23-51605, Inventory and Appraisement of Elizabeth Y. Chavez (ECF No. 109-2). The Inventory and Appraisement was verified by Ms. Chavez but not filed in the State Court divorce action.

[17] (*Id.*).

but not her original Schedules.[18] Second, Defendant listed a bourbon collection valued at $200,000.00 as her separate property on her Inventory.[19] At her second meeting of creditors on February 6, 2024, Defendant stated that she owned the bourbon collection but that her husband took the bourbon collection and that its value was overstated.[20] Defendant did not disclose a claim against her husband in her Original Schedules.[21] Also, Defendant listed a gold bracelet valued at $1,800.00 on her Inventory but not in her Schedules.[22]

After the discrepancies regarding Defendant's USAA policy, bourbon collection, and a claim against Ramiro Chavez for theft of Defendant's personal property, Defendant amended her Schedules and SOFA to list these items on her Amended Schedules and SOFA.[23]

In addition to Defendant's multiple meetings of creditors, Plaintiff also conducted a FED. R. BANKR. P. 2004 exam of Defendant on April 4, 2024.[24] During the Rule 2004 exam, Defendant provided Plaintiff with a copy of a Jewelers Mutual Group Insurance Policy.[25] Listed on the policy is a pair of diamond earrings with an insured value of $1,672.00. Defendant stated that she sold the earrings to her sister for $1,000.00 after ARS closed in July 2023 for necessities because Defendant had no income. The transfer of the earrings to her sister was not disclosed in her original Schedules.

The transfer that the Court received most of the evidence on was Defendant taking $20,000.00 out of ARS's bank account and whether the withdrawal was pre-petition or post-

---

[18] (UST-14 at RFP1-0925).
[19] (*Id*. at RFP1-0927).
[20] UST-9 19: 9-24; Bankruptcy case No. 23-51605, Transcript of 341 Meeting.
[21] UST-1 Bankruptcy Case 23-51605, Schedules, SOFA, and Summary (ECF No. 13).
[22] UST-14 at RFP1-0927.
[23] UST-2 Bankruptcy Case 23-51605, Amended Schedules and SOFA, and Summary (ECF No. 32). Defendant alleges that Ramiro Chavez stole a gold bracelet and other jewelry from her.
[24] UST-37.
[25] UST-15.

petition. ARS Specialty Contractors LLC filed a chapter 11 petition for relief on June 15, 2023.[26] Ramiro Chavez filed his Motion to Dismiss Case on July 10, 2024.[27] Ramiro Chavez alleged in his Motion that he had an ownership interest in ARS and did not consent to the filing of the chapter 11 petition. Ramiro Chavez argued that without the proper authorization to file the chapter 11 petition, the Court did not have subject matter jurisdiction over the case. Two joinders were filed in support of Ramiro Chavez's Motion to Dismiss.[28] After conducting an extensive evidentiary hearing on Ramiro Chavez's Motion to Dismiss, the Court denied the Motion because Ramiro Chavez failed to show that he had an ownership interest in ARS.[29] Nonetheless, the Court did find on the evidence adduced that there was waste, abuse, and inability to rehabilitate under 11 U.S.C. § 1112(b) and that the case should be converted to chapter 7.[30] In addition, the Court found that:

> Elizabeth Yetman Chavez is ordered to return the $20,000.00 she withdrew from Debtor's checking account at Jefferson Bank without court authority, by delivery to Frost Bank by no later than 5:00 pm CDT on Friday, July 28, 2023. If Elizabeth Yetman Chavez fails to do so, when the Chapter 7 Trustee is appointed, the Chapter 7 Trustee can ask for a show cause hearing as to why Elizabeth Yetman Chavez should not be held in contempt of court.
> (*Id*. at ¶ 4).

The parties offered differing views of how and why the $20,000.00 was withdrawn; whether bankruptcy counsel advised Defendant on concealing the withdrawal; and whether the withdrawal was a pre-petition or post-petition transfer. On June 30, 2023,[31] there is an email

---

[26] Bankruptcy No. 23-50751 (ECF No. 1).

[27] Bankruptcy No. 23-50751 (ECF No. 54).

[28] Bankruptcy No. 23-50751-Frost Bank Joinder to Ramiro Chavez's Motion to Dismiss (ECF No. 93) and Great American Insurance Co. Joinder to Ramiro Chavez's Motion to Dismiss (ECF 95).

[29] Bankruptcy No. 23-50751-Order Denying Motion to Dismiss [Doc. 54] and Granting Oral Motion to Convert Case to Chapter 7 (ECF No. 104 at ¶ 1).

[30] (ECF No. 104 at ¶ 2).

[31] ARS's Schedules and SOFA were due on June 29, 2023. On June 29, 2023, ARS asked for an extension of time to file its Schedules and SOFA. Bankruptcy No. 23-50551 (ECF No. 37). The Court granted the Motion and extended the time to file Schedules and SOFA until July 6, 2023 (ECF No. 38).

exchange between Defendant and her bankruptcy counsel, Joyce Lindauer and Sydney Ollar, about Defendant writing a check to herself in the amount of $20,000.00.[32] In the email string, there is an exchange between ARS counsel and Defendant about whether the $20,000.00 withdrawal should be disclosed.[33] Information regarding the withdrawal of the $20,000.0 was provided by Ramiro Chavez, who told Defendant's bankruptcy counsel about the withdrawal.[34] Defendant says in the June 30th email to bankruptcy counsel that she took the $20,000.00 out based on a recommendation from the ARS controller that suggested to Defendant that she take the money out to operate ARS until the Court approved a cash collateral budget.[35] Defendant did provide written proof of how the $20,000.00 was spent, including a ledger of employee payments, receipts for items purchased, and copies of checks.[36] When ARS filed its original schedules, Ms. Chavez indicated that there was no cash on hand on the petition date.[37] Nonetheless, Defendant admitted that she took $20,000.00 from the ARS bank account to operate ARS until a cash collateral order and budget were approved.[38] Defendant did not disclose the withdrawal of $20,000.00 in ARS's Initial Report Checklist,[39] her initial ARS debtor interview, or her first meeting of creditors.

---

[32] UST-18 describing the email string between counsel and Defendant.

[33] Defendant posits that Ollar told her not to disclose the $20,000.00 check because there is no place to input activity since filing of the petition. D-16 at Yetman 0682. That is inaccurate. Ms. Chavez did not ask Ollar in D-16 about how to disclose the $20,000.00 withdraw from the ARS bank account.

[34] UST-18 is an email string between counsel and Defendant regarding the $20,000.00 check. *See also* UST-22 at Lindauer 007078-007079 stating that Ramiro Chavez was writing checks to himself from the ARS bank account using Ms. Chavez's signature stamp. Ms. Chavez states that part of the reason she wrote the $20,000.00 check to herself was to pay bills so that ARS could survive until a cash collateral order was entered. Ms. Chavez alleges that Ramiro Chavez reported the $20,000.00 check to Lindauer to blackmail Ms. Chavez from reporting his alleged theft of ARS monies. Ms. Chavez did suggest to Lindauer that they file a pleading in either state court or in bankruptcy court to report Mr. Chavez's alleged theft. *See, e.g.* UST-25 (draft TRO application to be filed in Chavez divorce proceedings alleging Ramiro Chavez misappropriating ARS funds); UST-26 (Yetman email to Lindauer dated November 13, 2023, with attached spreadsheet detailing Ramiro Chavez's alleged theft of monies from ARS).

[35] (*Id.*) at Lindauer-006838.

[36] D-45 (duplicate copy of Sydney Ollar's deposition) Exhibit 7 at Yetman 01121-01163.

[37] UST-5 Bankruptcy No. 23-50751 (ECF No. 49, question 2).

[38] UST-22 at Lindauer 7079, 7080.

[39] UST 29 at RFP1-0939.

Plaintiff argues that the first time that the $20,000.00 check was identified was in Ramiro Chavez's Motion to Dismiss.

Plaintiff also alleged that Defendant concealed a claim of embezzlement by the former controller of ARS, Daniella Vasquez. The police report is dated May 23, 2022, and indicates that Ms. Vasquez embezzled ARS funds through fraudulent credit card purchases of at least $602,000.00, not including other withdrawals.[40] Defendant filed a police report. Plaintiff argues that this claim or cause of action was never listed in ARS's Schedules. Nonetheless, Defendant stated that the reason she did not list the theft by Daniella Vasquez was that Vasquez had spent all the stolen monies; there were no assets that Defendant could seize to satisfy any claim against Vasquez; and ARS did not have an insurance policy that covered or compensated for theft of funds.

Plaintiff also alleged other transactions or relationships that were either not disclosed or not entirely disclosed. Defendant admitted that she owned both Gavin Investment LLC and ARS LLC. Plaintiff contends that Defendant concealed that ARS was making rent payment deposits into Gavin Investment LLC's bank accounts that were not disclosed as transfers.[41] Additionally, these transfers were not listed on ARS's SOFA as transfers to insiders.[42] Defendant, in an email dated June 27, 2023, to ARS bankruptcy counsel, did provide a copy of an executed lease between Gavin Investment LLC. and ARS Specialty Contractors.[43] The attachment of the lease is not included in Defendant's exhibits.

---

[40] UST-30, San Antonio Police Report regarding ARS theft.

[41] UST-31, Gavin Investment LLC Frost Bank Account # XXX4307, January 2021 bank statement, Bates numbers 132 and 134 showing that ARS made payments to Gavin Investment LLC in the amounts of $4,500.00 and $1,800.00. *See also* UST-32, Gavin Investment LLC Frost Bank Account # XXX4307, January 2021-June 2023 bank statements evidencing similar deposits.

[42] UST-6 Bankruptcy No. 23-50751 (ECF No. 50) (question 4 does not indicate any transfers between Gavin Investments and ARS).

[43] D-13.

Defendant did ask bankruptcy counsel about disclosing executory contracts and what to include, although Defendant's question in her email to ARS counsel relates to customer leases and vehicle leases, not real property leases.[44] Defendant states that the Gavin Investment LLC-ARS lease is listed in her Schedules in Part 9, question 55.[45] The lease is described by location—307 Lombrano St.—but it does not list the lessor, lessee, or the amount of rent. Further, ARS counsel asks in red on a draft of her Schedules the purpose of the Gavin Investment LLC-ARS lease to which Defendant responds in blue "to house equipment and materials."[46]

Defendant also testified in summary form about the other alleged deficiencies in her bankruptcy Schedules and SOFA. Defendant explained that as part of the process in filling out her Schedules and SOFA that she was given a "Client Information" or "Homework Packet" that Defendant was to fill out so her bankruptcy counsel could prepare her Schedules and SOFA.[47] In doing so, Defendant explained that she did not have any collectibles to list.[48] Ms. Chavez also stated that she did not list her USAA life insurance policy because the Client Information form only asked about the cash value of any insurance policy and that the USAA policy was a term policy with no cash value.[49] The earrings that Defendant sold to her sister were not listed in the Client Information packet, nor were they listed in her Original Schedules. Defendant testified that she forgot about the sale of the earrings to her sister, stating that she sold them to have money because she had no income. Ms. Chavez further explained that there was no space on her bankruptcy worksheet to disclose the sale of the earrings.[50]

---

[44] D-15 at Yetman 00605.
[45] D-15 at Yetman 00619.
[46] *Id*.
[47] D-46.
[48] D-46 at 11.
[49] *Id*. at 12.
[50] The Defendant failed to list the transfer/sale of the earrings to her sister in her bankruptcy worksheet which specifically asks to list any transfers for the past 12 months. D-46 at 32. UST-15 (Personal Jewelry Declaration) lists

Defendant's testimony about her alleged interest in an expensive bourbon collection is inconsistent. Defendant testified at the trial that the bourbon collection was purchased during her marriage to Ramiro Chavez and that he purchased and maintained the bourbon collection. Further, Defendant testified that Ramiro Chavez took the bourbon collection when he moved out. Plaintiff did produce photos[51] of some of the bourbon collection that Defendant retained, but Defendant thought the remaining bourbon was of inconsequential value.[52] Defendant maintained that she listed her claims for theft against Ramiro Chavez in her Schedules. The Court has examined Defendant's citation to her Original, First Amended Schedules and Second Amended Schedules, stating that she listed claims against Ramiro Chavez, but all the Defendant lists is her divorce case with no specific reference to any claims against Ramiro Chavez for theft.[53]

The Court received into evidence the written deposition of Sydney Ollar, who at the time of ARS's bankruptcy filing, worked directly with Defendant in preparing the ARS Schedules and SOFA.[54] The parties read into evidence selected excerpts from Ms. Ollar's deposition. The Court finds that Ms. Ollar was deposed principally about her and supervising attorney, Joyce Lindauer's, advice regarding preparation of ARS's Schedules and SOFA. Ollar stated that she did the initial debtor interview of Defendant and assisted with the preparation of the initial ARS filings, attended the meeting of creditors, and negotiated with creditors.[55] Ollar explained that a firm paralegal would meet with the debtor representative and prepare an initial draft of the bankruptcy filings.[56] Ollar stated that after the initial draft was prepared, either she had follow-up conversations with

---

the earrings with an insurable value of $1,672.00. Curiously, Defendant did not list her earrings in her Inventory and Appraisement, but did list a gold bracelet with a value of $1,800.00. UST-14 at RFP1-0927.

[51] D-38.

[52] The Inventory and Appraisement filed February 23, 2023, in Defendant's divorce proceeding lists the bourbon collection as Defendant's separate property with a value of $200,000.00. D-14 at RFP1 0927.

[53] UST-1 (ECF No. 1 at p. 149 of 167) and UST-2 (ECF No. 2 at p. 22 of 28).

[54] UST-35 Remote Deposition of Sydney Antionette Carr dated June 17, 2025.

[55] UST-35 13: 6-11.

[56] *Id*. at 16: 1-10.

Defendant about the ARS Schedules and SOFA or Lindauer did.[57] Ollar explained that she would go over the draft of the schedules and SOFA with Defendant, asking Defendant questions that, in her experience, gave debtors or their representatives guidance on how to fill out the documents correctly.[58]

Ollar was specifically asked if she discussed with Defendant if there were any third-party claims or monies owed to ARS to which Defendant stated "no."[59] Ollar stated that Defendant did not mention any claims against ARS controller Daniella Vasquez but did recall that ARS might have some claims against Ramiro Chavez.[60] Ollar stated that she did discuss with Defendant the definition of "insider" but could not recall any specifics about their conversation.[61] Ollar also testified that she discussed with Defendant what an "affiliate" was and what is common ownership between entities.[62]

Ollar explained that the first time she learned about the $20,000.00 check Defendant wrote herself was on June 30, 2023.[63] Ollar recognized an email Defendant sent Ollar about the advice she received concerning the $20,000.00 check Defendant had written herself.[64] Ollar stated that Defendant did not ask Ollar for advice about the $20,000.00 check.[65] Ollar heard Lindauer explain to Defendant that as ARS bankruptcy counsel she needed to know the precise date of the withdrawal, how the money was spent, and any information about the transaction.[66] Although the $20,000.00 check is dated June 14, 2023, Ollar could not be sure based in part on her conversations

---

[57] *Id*.
[58] *Id*. at 16: 22-17: 7.
[59] *Id*. at 24: 1-10.
[60] *Id*. at 25: 4-20.
[61] *Id*. at 26: 8-25.
[62] *Id*. at 27: 4 –28: 14.
[63] *Id*. at 32: 10-15.
[64] *Id*. at 34: 10-22.
[65] *Id*. at 34: 23– 35: 1.
[66] *Id*. at 35: 20–36: 25.

with Defendant and what Ramiro Chavez alleged if the check was back dated and that the June 14th date was accurate.[67] Ollar did state if the check was a pre-petition check, that it needed to be disclosed on ARS's Schedules.[68] Adding to the confusion was Ollar's belief was that "there were certain details regarding her [Defendant] cashing the check and how she got the advice to write the check that were very unclear if was truly a pre or post-petition check."[69] Ollar did acknowledge that Lindauer made the ultimate decision with respect to pleadings or documents that were filed in a bankruptcy case and whether to disclose the $20,000.00 check.[70]

Ollar stated that her firm gives debtors blank schedules and SOFA to fill out as the initial draft.[71] Ollar testified that her firm does not give any specific instructions to debtors in filling out schedules and SOFA, other than that they needed to be "a complete picture and it needed to be true and correct."[72] Ollar stated that she was not the person who reviewed the ARS Schedules and SOFA that were filed.[73]

## ANALYSIS

### I.     Non-Dischargeability Under 11 U.S.C. § 727

Section 727 of the Bankruptcy Code states:

(a) The court shall grant the debtor a discharge, unless—

(1) the debtor is not an individual;

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

---

[67] *Id*. at 40: 1-8. Ollar deposition Exhibit 7 (Yetman 01120) is the $20,000.00 check. It is dated June 14, 2023, but the deposit date is June 20, 2023. Ollar deposition Exhibit 7 (Yetman 01121) shows some disbursements to ARS employees on June 19, 2023, which is a day before the $20,000.00 check was deposited.
[68] *Id*. at 73: 9-12.
[69] *Id*. at 74: 9-12.
[70] *Id*. at 51: 1-4.
[71] *Id*. at 52: 17-20.
[72] *Id*. at 60: 12-19.
[73] *Id*. at 55: 7-13.

**(A)** property of the debtor, within one year before the date of the filing of the petition; or

**(B)** property of the estate, after the date of the filing of the petition;

**(3)** the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

**(4)** the debtor knowingly and fraudulently, in or in connection with the case—

**(A)** made a false oath or account;

**(B)** presented or used a false claim;

**(C)** gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

**(D)** withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

**(5)** the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727(a)(1)–(5)(West 2020).

Section 727(a) provides that a court must grant a discharge unless one or more grounds for denial of discharge under § 727(a)(1)–(12) are proven to exist. The burden of proving a denial of discharge under § 727(a)(1)–(12) lies with the party objecting to discharge, and is by a preponderance of the evidence. ***Beaubouef v. Beaubouef,*** **(*In re Beaubouef)*,** 966 F.2d 174, 178 (5th Cir. 1992). Here, Trustee objects to Defendant's discharge pursuant to §§ 727(a)(2)(A), 727(a)(2)(B), 727(a)(4)(A), 727(a)(5), and 727(a)(7). The Court addresses each of Trustee's objections to discharge in turn.

19

### A. 11 U.S.C. § 727(a)(4)(A)— Denial Of Discharge Of Defendant Under 11 U.S.C. § 727(a)(4)(A) False Schedules, Statements of Financial Affairs, and False Testimony—Count I

Section § 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account. . . ."

In general,

> [t]he purpose of Chapter Seven of the Bankruptcy Code is to give individual debtors a "fresh start," and the heart of this goal is embodied in § 727's discharge provisions. *See, e.g.,* S. Rep. No. 989, 95th Cong., 2d. Sess. 7 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5793. "The discharge provisions require the court to grant the debtor a discharge of all his debts except for very specific and serious infractions on his part."

*In re Ichinose*, 946 F.2d 1169, 1172 (5th Cir. 1991).

Consistent with this general approach, it is the plaintiff who has the burden of proving an objection to discharge under § 727(a)(4)(A). *Beaubouef*, 966 F.2d at 178. "The elements of an objection to discharge under § 727(a)(4)(A) must be proven by a preponderance of the evidence." *Id.* Those elements are: "'(1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.'" *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005) (quoting *Beaubouef*, 966 F.2d at 178). "An omission of an asset can constitute a false oath." *In re Pratt*, 411 F.3d at 566.

When the Defendant submitted her Initial Schedules, she signed the Declaration Concerning Debtor's Schedules declaring under penalty of perjury that she had read the Schedules and that they were true and correct to the best of her knowledge, information, and belief. Before submitting the Initial SOFA, the Defendant signed the SOFA declaring under penalty of perjury that she had read the answers to the questions therein and that they were true and correct. Although

the Defendant does not dispute that she made omissions on her Initial Schedules and Initial SOFA, she disputes that she made omissions with fraudulent intent. Her argument ignores the fact that just months prior to filing bankruptcy, the Defendant was able to fully list and disclose her assets in connection with her divorce proceeding on the Inventory and Appraisement.

Defendant argues that she made amendments to cure the omissions. The Defendant's belated disclosure does not cure her wrongdoing. Once a debtor's wrongful and reckless conduct has been exposed, the debtor may not escape the consequences of such conduct by simply amending the schedules and disclosing the unlisted property. *See* ***Sholdra v. Chilmark Fin. LLP (In re Sholdra)***, 249 F.3d 380, 382–83 (5th Cir. 2001) ("[T]he existence of such amendments . . . do[es] not negate the fact that [the debtor] made knowingly false oaths in his original schedules and statement of financial affairs[,] . . . [especially when the debtor] file[s] the amendments only after the falsity of the original documents is revealed . . .").

That said, for the Court to find fraudulent intent under 11 U.S.C. § 727(a)(4)(A), the debtor need only have acted with reckless indifference to the truth, which can be found by circumstantial evidence. ***Pavy v. Chastant (In re Chastant)***, 873 F.2d 89, 91 (5th Cir. 1989); *see also* ***In re Sholdra***, 249 F.3d at 382 (denying discharge upon finding "reckless disregard for the truth"); ***In re Beaubouef***, 966 F.2d at 178 (finding "reckless indifference to the truth" where there was more than one falsehood and debtor failed to take advantage of an opportunity to clear up inconsistencies and omissions when filing amendments). Defendant's multiple omissions on her sworn Schedules and SOFAs show a pattern of disregard for the truth. When the schedules and statements contain omissions and inconsistencies, the schedules and statements themselves evidence a "pattern of disregard for the truth that supports fraudulent intent." ***Dupree v. Schott (In re Dupree)***, 145 F. App'x. 855, 856 (5th Cir. 2005) (per curiam). Defendant is not the typical debtor filing for

21

bankruptcy relief. She is an attorney, a former prosecutor, and a sophisticated owner of multiple businesses which further shows her recklessness in making false omissions on her sworn Schedules and SOFA.

Notably, "Bankruptcy Courts have not construed § 727(a)(4) generally to impose strict liability for the schedules and false statements." *Interfirst Bank Greenville, N.A., v. Morris (In re Morris)*, 58 B.R. 422, 427 (Bankr. N.D. Tex. 1986). Innocent mistakes and inadvertence are generally not sufficient to result in denial of a discharge. *See e.g., Mozeika v. Townsley (In re Townsley)*, 195 B.R. 54, 65 (Bankr. E.D. Tex. 1996) ("The denial of a discharge under § 727(a)(4)(A) cannot be imposed where the false statement was the result of a simple or honest mistake or inadvertence. Rather, to sustain an objection to discharge under this section, the debtor must have willfully made a false statement with intent to defraud his creditors.").

Nevertheless, a debtor need not have acted deliberately to deceive. *Beaubouef*, 966 F.2d at 178 ("It makes no difference that [the debtor] does not intend to injure his creditors when he makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them.") (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984) (per curiam)). The requisite intent can be shown by establishing that the debtor acted with reckless disregard for the truth, which can be proven by circumstantial evidence. *In re Sholdra*, 249 F.3d at 382 ("[S]tatements [made] with fraudulent intent–or reckless indifference to the truth . . . can be proven by circumstantial evidence."); *Beaubouef*, 966 F.2d at 178 ("[T]he existence of more than one falsehood, together with [the debtor's] . . . failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive."); *see also Ford v. Mellon Fin. Serv. Corp. (In re Ford)*, Civ. A. No. H-85-3551, 1986 WL 14997, at *4

(S.D. Tex. Dec. 18, 1986) ("When impeached, Debtor candidly admitted that expediency motivated the deception. Such reckless disregard for the truth is circumstantial evidence of the requisite fraudulent intent and will alone support denial of discharge."); *FDIC v. Sullivan* (*In re Sullivan)*, 204 B.R. 919, 942–43 (Bankr. N.D. Tex. 1997) (citing *Morris*, 58 B.R. at 428) ("A series of even innocent mistakes or omissions can constitute evidence of a pattern of reckless disregard for the truth. . . . Thus, courts look at the circumstances surrounding the omissions to determine whether they were intentional.").

As mentioned, a debtor's fraudulent intent may be established through actual evidence of intent to defraud, or through the cumulative effect of many falsehoods in a debtor's schedules as evidence of a reckless disregard for the truth. *In re Crumley*, 428 B.R. 349, 366–67 (Bankr. N.D. Tex. 2010) (citing *In re Sholdra*, 249 F.3d at 383).

The denial of a discharge—the "death penalty" sanction of bankruptcy—must not be undertaken lightly. *In re Crumley*, 428 B.R. at 367. (citing *Washington 1993, Inc. v. Hudson (In re Hudson)*, 420 B.R. 73, 100 (Bankr. N.D.N.Y. 2009)). Unquestionably, a debtor's paramount duty is to carefully consider all questions posed on the petition, schedules, and statements, and to verify the information listed is correct. *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 593–94 (Bankr. N.D. Tex. 1991). Nevertheless, "It may be close to impossible to produce Schedules and SOFAs that contain no mistaken information." *Cadle Co. v. Preston–Guenther (In re Guenther)*, 333 B.R. 759, 767–68 (Bankr. N.D. Tex. 2005)).

At Defendant's meetings of creditors on December 19, 2023, and February 6, 2024, the Defendant testified under oath that she disclosed all her assets and transactions on the Initial Schedules and Initial SOFA. The Defendant failed to disclose multiple assets, including: a USAA life insurance policy, a bourbon collection, and claims against Ramiro Chavez for allegedly taking

a "gold bracelet, 20 pesos gold pieces, bottles of liquor, 2 high-end grills, high-end purses and shoes." The Defendant also failed to disclose on her Initial SOFA that Ramiro Chavez removed items of personal property and certain rents from property owned by the Debtor or Debtor entity. Finally, the Defendant failed to disclose on her Initial SOFA and her Second Amended SOFA that she sold a pair of earrings to her sister for $1,000.00.

The Defendant's omissions relate to the "existence or disposition of property" of her bankruptcy estate and are thus material. *See Beaubouef*, 966 F.2d at 178 (finding that a false statement is material if it relates to the debtor's "business transactions or estate, or concerns the discovery of assets, business dealings, or the existence of the debtor's property"). Further, the suggestion that the earrings, for example, would have been exempt if disclosed is unavailing. A debtor has the duty to disclose all her assets. Further, the fact that some of the claims or causes of action—such as the Vasquez embezzlement or Ramiro Chavez theft—would not have resulted in any recovery for the estate is also unavailing. Again, a debtor has the duty to report all assets and to disclose them accurately.

Accordingly, the Court finds Defendant violated 11 U.S.C. § 727(a)(4)(A) by knowingly and fraudulently making a false oath or omissions as noted herein.  Therefore, Defendant's discharge is denied under § 727(a)(4)(A) of Count I of the First Amended Complaint.

**B. 11 U.S.C. § 727(a)(2)(A)—Sale of Earrings to Defendant's Sister—Count II.**

To sustain an objection under § 727(a)(2)(A), the objecting party must show: (1) the act complained of was done within the one year before the date of the filing of the petition; (2) the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done; (3) the act was committed by the debtor or a duly authorized agent of the debtor; and (4) the act was done with actual intent to hinder, delay or

defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code. *Lowry v. Croft* (*In re Croft*), 500 B.R. 823, 851 (Bankr. W.D. Tex. 2013) (citing *Village of San Jose v. McWilliams*, 284 F.3d 785, 793–94 (7th Cir. 2002)). For purposes of analyzing what constitutes a transfer under § 727(a)(2), the definition of transfer is to be applied as broadly as possible. *See id.*

The final requirement to deny a discharge under § 727(a)(2)(A) requires that the act complained of must be done with intent to hinder, delay, or defraud a creditor. *In re Chastant*, 873 at 90–91. Further, the intent must be actual intent and not constructive intent. *First Tex. Sav. Ass'n, Inc. v. Reed (In re Reed)*, 700 F.2d 986, 991–92 (5th Cir. 1983). That said, a finding of actual intent may be based on circumstantial evidence or inferences from a course of conduct. *In re Chastant*, 873 F.2d at 91; *see also*, *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 753–54 (9th Cir. 1985). Moreover, The Fifth Circuit has identified the following factors that may provide evidence of actual intent to defraud:

> (i) a lack or inadequacy of consideration, (ii) a familial or close relationship between the parties, (iii) retention of possession, benefit, or use of the property in question, (iv) the financial condition of the party sought to be charged both before and after the transaction in question, (v) the existence or cumulative effect of a pattern or course of conduct after the incurring of a debt, onset of financial difficulties or threat of suits by creditors, and (vi) the general chronology of the events and transactions at issue.

*TSCA-234 Ltd. P'ship v. Moseman (In re Moseman)*, 436 B.R. 398, 409 (Bankr. E.D. Tex. 2010) (citing *Pavy*, 873 F.2d at 91). Here, Trustee contends Defendant violated § 727(a)(2)(A) because she failed to disclose on her Initial SOFA and First Amended SOFA her transfer of diamond earrings to her sister—an insider—in July of 2023. Defendant failed to disclose the transfer on the Initial SOFA and the First Amended SOFA. Defendant did not disclose the sale of the earrings until Defendant turned over to Plaintiff copies of an insurance policy revealing that Defendant was

the named insured for a pair of earrings valued at $1,672.00 as of December 12, 2021. After turning over the insurance policy, Defendant informed the Plaintiff of the sale of the earrings for $1,000 cash. Defendant eventually disclosed the transfer in her Second Amended SOFA. Defendant has no documentation to corroborate her testimony that she sold the earrings to her sister for $1,000 cash, but she has represented that her financial condition was poor before selling the earrings.

Defendant's primary defense to these assertions is that the failure to disclose was inadvertent; she was distracted by her divorce; the earrings could have been exempted if disclosed; and that Defendant had to support herself because she had no income. None of these contentions are persuasive or rebut Plaintiff's evidence.

The Court finds that Defendant transferred or concealed property within one year before the date of filing the petition, thereby satisfying the first three requirements of § 727(a)(2)(A). Defendant filed her chapter 7 bankruptcy on November 21, 2023. In the year prior to the chapter 7 filing, Defendant sold diamond earrings to her sister, Karla Blue, on July 30, 2023, for $1,000. Defendant failed to disclose the sale on their Statement of Financial Affairs filed on December 5, 2023, and the Amended SOFA filed on February 13, 2024. Here the diamond earrings were transferred to the Defendant's sister, Karla Blue.

Defendant has failed to rebut this presumption of fraud. Defendant argues that the transfer of the diamond earrings to Karla Blue was not done with intent to hinder, delay, conceal or defraud. Defendant had multiple opportunities to disclose the sale to her sister. She failed to do so. Defendant acted with intent to hinder, delay, conceal, or defraud their creditors from collecting from her. The Court finds that the Plaintiff has met his burden under § 727(a)(2)(A), and Defendant is denied a chapter 7 discharge on Count II of the Complaint under § 727(a)(2)(A).

**C. Denial Of Discharge Of Defendant Under 11 U.S.C. § 727(a)(7) and 11 U.S.C. § 727(a)(4)(A) False Schedules, Statements of Financial Affairs, and False Testimony in ARS Case—Count III**

Section § 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." ARS is an insider of Defendant pursuant to 11 U.S.C. § 101(31). 11 U.S.C. § 727(a)(7) provides that the Court shall deny a debtor a discharge when "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under the title or under the Bankruptcy Act, concerning an insider." To prevail on an objection to discharge under 11 U.S.C. § 727(a)(4)(A) for a false oath, the movant must prove by a preponderance of the evidence that: "(1) the debtor made a statement under oath in, or in connection with, the bankruptcy case; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case." *Coleman Cnty. State Bank v. Boyd (In re Boyd)*, No. 17-40426, 2024 WL 557927, at *23 (Bankr. N.D. Tex. Feb. 12, 2024).

Trustee alleges Defendant made omissions and false statements under oath in ARS's bankruptcy case. Defendant signed the ARS Schedules and SOFA under penalty of perjury. The ARS Schedules, SOFA, and Conversion Schedules had several false oaths or accounts. First, Defendant stated that ARS had no cash on hand as of the ARS petition date; this statement was false because, as Defendant testified at a hearing on a motion to dismiss the ARS bankruptcy case, she was allegedly advised by ARS's controller to write the $20,000.00 check to her before the ARS petition date so that she could have cash on hand. Second, Defendant failed to disclose an over $700,000 embezzlement claim held by ARS against Daniella Vasquez on the ARS Schedules

and ARS Conversion Schedules. Third, Defendant failed to disclose on the ARS SOFA the rent payments made by ARS to insider Gavin Investment LLC during the year prior to ARS's bankruptcy filing.[74]

Defendant's answers in the multiple sworn Schedules and SOFAs of ARS show a pattern of disregard for the truth. *See In re Dupree*, 145 F. App'x. at 856 (finding repeated schedule omissions and inconsistent testimony to evidence a "pattern of disregard for the truth that supports fraudulent intent"). Defendant alleges that she relied on ARS's bankruptcy attorneys to prepare the ARS Schedules, ARS SOFA, and ARS Conversion Schedules. This argument is wholly inconsistent with the historical email messages between the Defendant and ARS's attorneys and the testimony of ARS's attorney Sydney Carr, both of which show that ARS's attorneys were unaware of the $20,000.00 check until Ramiro Chavez sent an email on June 30, 2023, informing them that the Defendant had written a backdated $20,000 check to herself.[75]

After Ramiro Chavez revealed that the Defendant had written herself the $20,000.00 check (and before the ARS Schedules and SOFA were filed), ARS's bankruptcy attorneys Joyce Lindauer and Sydney Carr spoke with the Defendant to gather more information about the $20,000.00 check.[76] Carr testified that she and Lindauer never "got a straight answer" from Defendant about when the $20,000.00 check was written or when it was drawn.[77] Also, Carr testified that the $20,000.00 check was not included on the ARS Schedules nor the SOFA because

---

[74] One court has determined that a per se insider under § 101(31) to include an insider's solely owned corporation (that is an insider to insider) transfer did not satisfy the requirements of § 547(b). That said, the issue is not if the Defendant meet the definitional requirements of insider, but whether the Defendant adequately disclosed payments from ARS (her wholly owned entity) to another wholly owned entity (Gavin Investments LLC). *In re Enter. Acquisition Parners., Inc.*, 319 B.R. 626, 632 (9th Cir. B.A.P. 2004).

[75] UST-20-24, 35.

[76] UST-35 at 34.

[77] *Id*. at 36-37.

"it was not clear to [her and Ms. Lindauer]" whether the date of June 14, 2023, on the $20,000.00 check "was a correct date."[78]

"A debtor's reliance on advice of counsel constitutes an excuse for [an error or omission] . . . only where his reliance is reasonable and in good faith." *In re Boyd*, 2024 WL 557927, at *25 (alteration in original) (quoting *In re Dreyer*, 127 B.R. at 597). "As a matter of law, reliance on advice of counsel is no defense to an action under 11 U.S.C. § 727(a)(4)(A) where [the] debtor has knowingly sworn to false information." *Id*. (citations omitted). Defendant is a licensed attorney, former prosecutor, and long-time business owner. Importantly, Defendant is the only person with actual knowledge of when the $20,000.00 check was cashed and how it was used. Defendant signed the ARS Schedules and ARS SOFA—which contained multiple omissions—under penalty of perjury. At the ARS meeting of creditors on July 14, 2023, Defendant again knowingly declared under oath that she read the ARS Schedules and ARS SOFA, and that all the information disclosed was accurate. *See In re Gartner*, 326 B.R. 357, 374 (Bankr. S.D. Tex. 2005) (finding that the reasonableness of the debtor's reliance on attorney advice is "undermined where the debtor has admitted under oath to having read and signed the Schedules and Statement of Financial Affairs" with falsehoods that are being challenged). Despite having multiple opportunities to disclose the $20,000.00 of ARS funds she was holding, Defendant failed to do so. Moreover, Defendant failed to disclose Vasquez embezzlement claim and an ARS's claim against Ramiro for theft of estate property.[79]

Because Defendant made false oaths on the ARS Schedules, SOFA, and Conversion Schedules, her discharge is denied pursuant to 11 U.S.C. §§ 727(a)(4) and (a)(7).

---

[78] *Id*. at 39-40.
[79] There is no affirmative proof that Defendant repaid the $20,000.00 or when it occurred.

**D. Denial Of Discharge Of Defendant Under 11 U.S.C. § 727(a)(7) and 11 U.S.C. § 727(a)(2)(B) Concealed Asset in ARS Case—Count IV**

Section 727(a)(2)(B) of the Bankruptcy Code provides that a debtor will be denied a discharge when "the debtor with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated or concealed or has permitted to be transferred, removed, destroyed, mutilated, or concealed property" of the estate after the date of the filing of the petition.

11 U.S.C. § 727(a)(7) provides that the Court shall deny a debtor a discharge when "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under the title or under the Bankruptcy Act, concerning an insider."

11 U.S.C. § 727(a)(2)(B) requires a denial of discharge when there is: (1) a transfer [or concealment] of property; (2) belonging to the debtor; (3) within one year of the filing of the petition [or after the date of the filing of the petition]; and (4) with intent to hinder, delay, or defraud a creditor or officer of the estate. *Duncan*, 562 F.3d at 698. "Proof of actual intent is necessary, which can be inferred from the debtor's actions and circumstantial evidence." *Id*. at 698 (citation omitted). The "badges of fraud" can also be used to ascertain actual fraud. *See In re Chastant*, 873 F.2d at 91.

In the ARS bankruptcy case, the Defendant intentionally failed to disclose $20,000.00 of cash she took from the ARS Jefferson Bank account ending 5715 after the ARS petition date. The Defendant should have known that she was not permitted to use funds of ARS's bankruptcy estate after the ARS filed its chapter 11 case. Defendant did not reveal any information to the Court or creditors about the $20,000.00 check until Ramiro Chavez's counsel questioned her regarding the transaction at a hearing on a motion to dismiss ARS's bankruptcy case.

30

The Court acknowledges that Defendant asked her counsel on June 30, 2023, for guidance on what to do about the $20,000.00 check that was written and deposited prior to telling counsel. The problem is that by the time Defendant asked for advice about how to disclose the $20,000.00, she had spent the funds. The Court has carefully examined the ledger and receipts in UST-19, and they all appear to predate June 30, 2023, and some predate the June 20, 2023, deposit date. As such, Ollar and Lindauer could not advise Defendant on what to do or not do, because the act of taking and spending the money had already occurred, and possibly before the check was deposited. In holding and spending $20,000.00 of ARS's cash without disclosing it, Defendant acted with intent to hinder, delay, or defraud ARS's creditors, and the Defendant's discharge is denied under 11 U.S.C. §§ 727(a)(2)(B) and (a)(7).

**E. Denial Of Discharge Of Defendant Under 11 U.S.C. § 727(a)(7) and 11 U.S.C. § 727(a)(5) Failure to Satisfactorily Explain Loss or Deficiency of ARS Assets to Meet ARS's Liabilities—Count V.**

11 U.S.C. § 727(a)(7) provides that the Court shall deny a debtor a discharge when "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under the title or under the Bankruptcy Act, concerning an insider."

Plaintiff notes ARS had gross revenue of $13,222,137.81 in 2021, $16,510,514.48 in 2022, and $5,912,737.76 for January 1, 2023, through June 15, 2023. Despite having earned significant income, ARS reported only $70,205.47 in funds held in bank accounts on the ARS Petition Date. The claims register for ARS reflects total claims of $22,408,606. Plaintiff requested Defendant provide ARS tax returns and financial records for 2021 through 2023. Additionally, Plaintiff asked both Defendant and the Chapter 7 Trustee of ARS's bankruptcy estate for QuickBooks records to evaluate ARS's disposition of its revenue in the three years before it filed for bankruptcy, but

neither has been able to produce any such records. A debtor cannot "overcome a § 727(a)(5) objection with mere general explanations . . . and no documentary evidence" to show how funds were spent. ***Keils v. Villarreal (In re Villarreal)***, 666 B.R. 157, 168 (Bankr. N.D. Tex. 2024). As such, Plaintiff argues that because Defendant has not provided documents to show how ARS spent funds received from its sizeable revenues in 2021 through 2023, the Court should deny the Defendant's discharge under 11 U.S.C. §§ 727(a)(5) and (a)(7). There is no record evidence that Defendant failed to provide documents to Plaintiff.

Finally, § 727(a)(5) provides that a debtor will be denied a discharge where the debtor fails to explain satisfactorily the loss of assets or deficiency of assets to meet the debtor's liabilities. Section 727(a)(5) does not require specific allegations of fraud but does require that the plaintiff identify which assets have been lost. *See **Nof v. Gannon (In re Gannon)***, 173 B.R. 313, 317 (Bankr. S.D.N.Y. 1994) (denying discharge based on fraudulent withholding of information).

Trustee bears the initial burden to show some evidence that specific assets were lost, at which point the debtor must satisfactorily explain what happened to the assets. *See **In re Chalik***, 748 F.2d at 619 (denying discharge for failure to explain loan of $130,000 to debtor). The burden on the debtor is to explain satisfactorily to the Court what has happened because the debtor has access to the operative facts. ***Poolquip-McNeme, Inc. v. Hubbard (In re Hubbard)***, 96 B.R. 739, 742 (Bankr. W.D. Tex. 1989).

In the First Amended Complaint, Plaintiff alleges, upon information and belief, that the ARS Schedules and ARS SOFA, signed by Defendant, do not satisfactorily explain the loss of assets or deficiency of assets of ARS to meet ARS's liabilities.[80] In the Joint Pretrial Order, Plaintiff cites that there are unexplained liabilities and transfers.[81] The evidence adduced at trial

---

[80] (ECF No. 13 at ¶ 135).
[81] (ECF No. 34 at ¶¶ 69-75).

was that Defendant was not involved in or managed ARS from 2019 to 2023. Further, most of the allegations Plaintiff makes in his First Amended Complaint occurred while Defendant was not involved in the business. Therefore, the Court cannot find that Debtor's discharge is denied under § 727(a)(5).

### Conclusion

For the reasons stated herein, the Trustee's Complaint pursuant to 11 U.S.C. § 727 is GRANTED IN PART and DENIED IN PART. Specifically, the Trustee's Complaint pursuant to 11 U.S.C. §§ 727 (a)(5) is DENIED. Trustee's Complaint pursuant to 11 U.S.C. §§ 727(a)(4)(A), 727(a)(2)(A), 727(a)(7), and 727(a)(2)(B) is GRANTED. Therefore, Defendant's discharge pursuant to 11 U.S.C. § 727(a) is hereby DENIED. All other relief is DENIED.

# # #